Dustin L. Schubert (S.B.N. 254876)
(dschubert@sjk.law)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union. St., Suite 200
San Francisco, California 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161

Justin A. Kuehn (*pro hac vice* forthcoming)
(justin@kuehn.law)
Molly J. Brown (*pro hac vice* forthcoming)
(molly@kuehn.law)
**KUEHN LAW, PLLC**
53 Hill St., Suite 605
Southampton, New York 11968
Telephone: (833) 672-0814

*Counsel for Plaintiff Ross Thomas*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO / OAKLAND DIVISION**

| | |
|---|---|
| ROSS THOMAS, Derivatively on Behalf of ENOVIX CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THURMAN J. RODGERS, RAJ TALLURI, BETSY ATKINS, PEGAH EBRAHIMI, BERNARD GUTMANN, JOSEPH MALCHOW, GREGORY REICHOW, HARROLD RUST, EMMANUEL T. HERNANDEZ, JOHN D. MCCRANIE, and STEFFAN PIETZKE,<br><br>Defendants,<br><br>- and -<br><br>ENOVIX CORPORATION,<br><br>Nominal Defendant. | Case No. 3:26-cv-01988<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Ross Thomas ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Enovix Corporation ("Enovix" or the "Company"), files this Verified Stockholder Derivative Complaint against Thurman J. Rodgers, Raj Talluri, Betsy Atkins, Pegah Ebrahimi, Bernard Gutmann, Joseph Malchow, Gregory Reichow, Harrold Rust, Emmanuel T. Hernandez, John D. McCranie, and Steffan Pietzke (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Enovix.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Enovix, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California captioned *In Re Enovix Corporation Securities Action*, 3:23-cv-00071-SI (the "Securities Action'"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Enovix against certain of its officers and directors (the "Board") seeking to remedy Defendants' violations of law that have occurred from August 10, 2021 to October 2, 2023 (the "'Relevant Period'"), and have caused, and continue to cause, substantial harm to Enovix Corporation and its shareholders, including monetary losses and damages to Enovix Corporation's reputation and goodwill.

2. Defendant Enovix is an early-stage technology company claiming to develop a new type of lithium-ion ("Li-ion") battery that is smaller and stronger than conventional Li-ion batteries. Enovix represented that it intended to sell these batteries to other companies for integration into consumer electronics and related products. However, the mere development of advanced battery

technology does not, by itself, generate revenue. To achieve commercial viability, Enovix was also required to establish the capability to manufacture its batteries at a scale sufficient to meet customer demand.

3. In February 2021, Enovix announced its intention to become a public company. Rather than proceeding through a traditional and more strictly regulated initial public offering ("IPO"), Enovix completed a merger with Rodgers Silicon Valley Acquisition Corp ("RSVAC"), a public special purpose acquisition company known as a "SPAC" or "blank check" company (the "Merger").

4. At the time the Merger was announced, Enovix established an "ambitious goal" to develop its own U.S.-based manufacturing line and commence delivery of products to customers, thereby generating the Company's first product revenues, by the second quarter of 2022. To achieve its projected revenue targets, Enovix calculated that it would need to manufacture one battery every two seconds, necessitating four manufacturing lines each capable of producing 550 units per hour ("UPH").

5. Enovix commenced the procurement of custom manufacturing equipment for its initial production facility, "Fab-1," in early 2020. Fab-1 was situated in Fremont, California. To secure the necessary equipment, Enovix entered into agreements with vendors tasked with designing and fabricating specialized manufacturing machinery. A significant portion of the development and production of Fab-1 equipment was outsourced to Shenzhen Yinghe Technology Co. Ltd. ("Yinghe") in China.

6. To govern the procurement of equipment from Yinghe, Enovix maintained an Equipment Procurement Review ("EPR"). The EPR is a formal document authorizing the allocation of funds for the purchase of equipment from a vendor. It specifies parameters that must be satisfied before the purchase agreement can be finalized, including the requirement that the equipment successfully pass critical quality tests prior to Enovix accepting delivery.

7. The Fab-1 equipment Enovix arranged to purchase from Yinghe was required to pass the Factory Acceptance Test ("FAT"). The FAT was governed by specific criteria set forth in a checklist provided by Enovix, detailing performance and quality specifications necessary for

compliance. The principal parameters under the FAT included capacity, defined by the number of units the equipment could fabricate within a specified time frame (*i.e.*, UPH), and quality, measured by industry-standard production efficiency metrics assessing the frequency with which good units were produced at maximum speed without interruption.

8. Pursuant to Enovix's EPR, the FAT required that Enovix's engineers travel to China to personally observe the equipment operating at full speed during the FAT to confirm that the machinery was functioning as intended. However, due to COVID-19-related travel restrictions in late 2020 and early 2021, Enovix's engineers were not permitted to travel to China and therefore did not participate in the FAT.

9. The initial FAT for the Yinghe-manufactured Fab-1 equipment occurred around November and December 2020, consisting of three or four iterations of testing spaced approximately two to four weeks apart. The equipment failed the FAT. Specifically, the production yield achieved by the equipment was extremely low and never approached Enovix's required capacity specifications.

10. Following the initial failed FAT, Yinghe continued working on the equipment and conducted additional testing for several months, but without success. The Fab-1 equipment never satisfied the FAT requirements. These ongoing efforts and repeated tests culminated in a final FAT conducted by Yinghe in April 2021, which the equipment again failed.

11. At that point, Defendants Harrold Rust, Enovix's co-founder and Chief Executive Officer ("CEO"), and Thurman J. Rodgers, RSVAC's CEO and Chairman, and post-Merger Enovix's Chairman, secretly decided to waive the requirement that the equipment, which had repeatedly failed the FAT over the prior six months, pass the FAT before Enovix accepted delivery, and arranged for it to be flown to Fremont regardless. They planned to "catch up later" through continued improvement efforts and testing after installation in Fremont, California. Defendants expended $1.4 million to prematurely transport the equipment so they could represent to investors that the Fab-1 equipment had arrived and was installed while the critical Merger was pending shareholder approval.

12. Unsurprisingly, the problems with the Fab-1 equipment did not resolve upon its transport to California. Enovix's engineers installed the equipment at Fab-1 without the assistance of Yinghe's engineers, thereby violating another requirement of the EPR known as the Site Acceptance Test ("SAT"). The SAT mandated that Yinghe's engineers travel to the United States to assist with installation and testing, ensuring that the equipment continued to meet Enovix's specifications after passing the FAT, which the equipment never did, and then disassemble the equipment, transport to, and reassemble at Enovix's facilities.

13. Enovix's engineers spent months attempting to bring the Fab-1 equipment to full operational capacity, but their efforts were unsuccessful. Ultimately, the Company agreed to fund travel for Yinghe's engineers to California to assist with repairs and testing. Their efforts likewise failed. Despite continued work over an extended period, the equipment never came close to meeting Enovix's capacity and quality specifications.

14. By June 2022, the Fab-1 equipment was producing at ***less than 10%*** of the expected rate. By December 2022, production increased to approximately 100 UPH, still drastically below the 550 UPH benchmark that formed the basis of Enovix's revenue projections. As a result, Fab-1 never came close to achieving the production rates and volumes necessary to support commercial sales, rendering the Company's projected revenue timeline wholly unattainable.

15. During this time, the Company's investors were deprived of material information. Defendants repeatedly issued false and misleading statements that concealed critical facts regarding the Fab-1 equipment's repeated failures, unsuccessful tests, and the waiver of EPR requirements.

16. Defendants told investors that the Fab-1 equipment "must perform to specification at the vendor's factory before shipment to Enovix" and touted the arrival and installation of the equipment at Fremont, while omitting that Rust and Rodgers had waived that very requirement and, in fact, the equipment had repeatedly failed to perform to anywhere near specification. Defendant Rust boasted that, with respect to the Fab-1 equipment, "[w]e have a pretty rigorous set of both factory and site acceptance things we have to go through and ***I would say there's no red flags there.***"[1]

---

[1] All emphasis added unless stated otherwise.

17. The truth began to surface on November 1, 2022, when Enovix disclosed that it had generated only eight thousand dollars in revenue during the third quarter of 2022. It also announced that it would be "dialing back" efforts to improve the "Gen1" lines at Fab-1 and instead shift focus to future "Gen2" lines (to be installed at planned production facilities), because the "improvements" to Fab-1 previously referenced were not delivering the intended results. Consequently, Enovix stated it "anticipate[d] achieving lower overall output from Fab-1 in 2023." In fact, the Company revealed it expected to produce fewer than one million batteries in 2023, only a fraction of what would have been achieved if it were manufacturing one battery every two seconds and operating multiple lines at 550 UPH, as originally projected.

18. This news shocked the market, driving Enovix's share price down by $7.46, a steep 41% decline.

19. A few days later, on November 7, 2022, Enovix announced that Rodgers would assume the role of Executive Chairman. In a public statement, Rodgers admitted, "[w]e have poorly communicated on the status of Fab-1" and partially disclosed that he and Rust had waived the FAT, without revealing the repeated failed tests before and after the waived FAT. Despite the production delay, Rodgers assured investors that "Fab-1 is going to work and ship a lot of batteries to our customers."

20. On January 3, 2023, Rodgers delivered a special investor presentation. In his remarks, Rodgers acknowledged the Company's "lack of clear and transparent investor communications" about Fab-1, "that led some of our investors to say we're outright dishonest with them." He further admitted, ***"I think they were reasonably misled."***

21. Rodgers disclosed that the first production line at Fab-1 "is nonfunctional for automation point of view. That means its rated capacity of 550 UPH is really more like 100, and obviously, that wreaks havoc with output and promises." He explained that Fab-1 was producing only one battery every 72 seconds and admitted, "we don't think that machine if we worked on it forever would be over 200." Due to these equipment issues at Enovix's Fab-1 facility, Rodgers conceded that Fab-1 was "doing less than 10% of what it should be doing."

22. On this news, Enovix's share price fell another 41%, dropping $4.97 per share.

23. On October 3, 2023, Enovix announced it was shutting down commercial production operations at Fab-1, laying off 185 employees and writing off $36 million in Fab-1 manufacturing equipment. The "improvements" to Fab-1 equipment had progressed slower than expected, and the equipment continued to operate at only a fraction of its intended capacity. After years of failed testing and attempted fixes, the Company was finally forced to acknowledge that it had completely failed to achieve the long-promised commercial capabilities of its Fab-1 production lines.

24. On this news, Enovix's share price fell 13%, dropping $1.51 per share.

25. During the Relevant Period, the Individual Defendants breached their fiduciary duties by intentionally or recklessly making, or allowing others to make, materially false and misleading statements and omissions about the Company's business, operations, and prospects. Specifically, they failed to disclose that: (a) the Fab-1 equipment manufactured by Yinghe consistently failed to meet specifications despite months of factory acceptance testing in China; (b) the Company waived the requirement for the equipment to pass FAT prior to delivery, a decision that enabled the transport of the equipment from China; and (c) despite months of on-site testing in California, the equipment never came close to meeting Enovix's required specifications.

26. As a result of the foregoing, Enovix, as well as the Company's CEO and Chief Financial Officer ("CFO"), were named as defendants in the Securities Action by investors who allege they were damaged when they purchased Enovix shares during the Relevant Period. On July 7, 2024, U.S. District Judge Susan Illston issued an order denying in part Defendants' Motion to Dismiss in the Securities Action (the "Order").[2]

27. Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of Enovix, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Action, a majority of Enovix's Board of Directors cannot impartially consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence, thereby excusing a pre-suit demand.

---

[2] *Twitchell, et al. v. Enovix Corporation, et al.* No. 3:23-cv-00071-SI, Order Granting in Part and Denying in Part Motion to Dismiss SAC (Doc. 105) (N.D. Cal. July 7, 2024) (ECF No. 116).

**JURISDICTION AND VENUE**

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R. § 240.142-9) promulgated thereunder by the SEC.

29. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

31. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

32. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

33. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the transaction and wrongs complained of herein occurred in this District, and the Company maintains its principal executive offices within this District.

34. Divisional Assignment: This action arises in Alameda County, in that a substantial part of the events which give rise to the claims asserted herein occurred in Alameda County, where Enovix is headquartered and located. Pursuant to L.R. 3-2(d), all civil actions that arise in Alameda County shall be assigned to the San Francisco Division or Oakland Division.

**PARTIES**

***Plaintiff***

35. Plaintiff is, and has been at all relevant times, a shareholder of Enovix.

***Nominal Defendant***

36. Nominal Defendant Enovix is incorporated under the laws of Delaware, with its principal executive office located at 3501 W. Warren Avenue, Fremont, CA 94538. Enovix common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "ENVX."

***Individual Defendants***

37. Defendant Rodgers ("Rodgers") has served as a director of the Company since 2012 and assumed the role of Chairman of the Board in April 2023, following a term as Executive Chairman from November 2022 through April 2023. Defendant Rodgers is also named as a defendant in the Securities Action.

38. The Company's 2024 Proxy Statement stated the following about Defendant Rodgers:

> **Thurman John Rodgers**, age 76, has served as Chairman of our Board of Directors since April 2023, and previously served as our Executive Chairman from November 2022 to April 2023, as Chief Executive Officer of Rodgers Silicon Valley Acquisition Corp ("RSVAC"), a special purpose acquisition company that completed its business combination with Enovix Corporation, a Delaware corporation ("Legacy Enovix") in July 2021, following which RSVAC changed its name to Enovix Corporation, as Chairman of the Board of Directors of Legacy Enovix from September 2020 until its merger with and into Enovix Corporation in January 2023, and as a member of Legacy Enovix's Board of Directors from February 2012 to January 2023.
>
> **Mr. Rodgers** founded Cypress Semiconductor Corporation, a semiconductor company, in 1982 and served as the president, chief executive officer and as a member of its Board of Directors until April 2016. Since January 2017, Mr. Rodgers has served on the Board of Directors of Enphase Energy, Inc., and from January 2017 until January 2023, served as Chairman of the Board of Directors of FTC Solar, Inc., both of which are public companies in the energy industry. Since June 2023, Mr. Rodgers has served as Executive Chairman of Complete Solaria, a publicly-traded solar technology company, and as a member of its Board of Directors since November 2022. From May 2002 to May 2011, Mr. Rodgers served as a member of the Board of Directors of SunPower Corporation, an energy company. Mr. Rodgers is presently a member of the Board of Directors of several privately-held companies. From June 2004 through December 2012, Mr. Rodgers was a member of the board of trustees of Dartmouth College, his alma mater. He holds a B.S. in Physics and Chemistry from Dartmouth and a M.S. and Ph.D. in Electrical Engineering from Stanford University. At Stanford, Mr. Rodgers invented, developed and patented VMOS technology.

> We believe that Mr. Rodgers is qualified to serve on our Board of Directors based on his public company board experience, industry knowledge and expertise and skills in strategy and management.

39. According to Proxy Statements filed with the SEC, in fiscal years 2021, 2022, and 2023, Defendant Rodgers received $91,115, $169,989, and $183,490 respectively in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 83,500 | 99,990 | 183,495 |
| **2022** | 70,000 | 99,989 | 169,989 |
| **2021** | 35,000 | 56,110 | 91,110 |

40. Defendant Raj Talluri ("Talluri") has served as President, CEO of the Company, and as a member of the Board since January 2023.

41. The Company's 2024 Proxy Statement stated the following about Defendant Talluri:

> **Dr. Raj Talluri**, age 61, has served as our President and Chief Executive Officer and as a member of our Board of Directors since January 2023. Prior to joining Enovix, Dr. Talluri was Senior Vice President and General Manager of the Mobile Business Unit at Micron Technology Inc., a publicly-traded global company, focused on creating data memory and storage solutions, from March 2018 through December 2022. Prior to Micron, from 2009 through March 2018, Dr. Talluri was at Qualcomm Inc., a publicly-traded multinational company, focused on designing and manufacturing semiconductors and wireless telecommunications products, where he served as Senior Vice President and General Manager of the Internet of Things business unit from 2015 through March 2018. Dr. Talluri began his career at Texas Instruments, a publicly-traded global company, focused on designing, manufacturing and embedding semiconductor chips, from 1993 through January 2009, first as a member of the technical staff and then successively leading product groups and business units over a 16-year tenure culminating with becoming general manager of the OMAP wireless terminals business unit. Dr. Talluri holds a Ph.D. in Electrical Engineering from the University of Texas at Austin, a Master of Engineering degree from Anna University in Madras, India, and a Bachelor of Engineering from Andhra University in Waltair, India.
>
> We believe that Dr. Talluri is qualified to serve on our Board of Directors based on his executive and leadership experience and technical expertise.

42. According to the Proxy Statement filed with the SEC, in fiscal year 2023, Defendant Talluri received $17,002,557 in compensation from the Company.

| FISCAL YEAR | SALARY ($) | STOCK AWARDS ($) | NON-EQUITY INCENTIVE PLAN COMPENSATION ($) | ALL OTHER COMPENSATION ($) | TOTAL ($) |
|---|---|---|---|---|---|
| **2023** | 519,846 | 16,140,000 | 328,719 | 13,992 | 17,002,557 |

43. Defendant Betsy Atkins ("Atkins") has been a member of the Board since July 2021 and currently serves as the Chair of the Nominating and Corporate Governance Committee as well as a member of the Compensation Committee. Defendant Atkins is also named as a defendant in the Securities Action.

44. The Company's 2024 Proxy Statement stated the following about Defendant Atkins:

> **Betsy Atkins**, age 70, has served as a member of our Board of Directors since July 2021 and previously served as a member of Legacy Enovix's Board of Directors from January 2021 to January 2023. Since 1994, Ms. Atkins has served as the chief executive officer of Baja Corp, an independent venture capital firm focused on technology, renewable energy and life sciences. Ms. Atkins currently serves on the public company boards of SL Green Realty Corp., a real estate investment trust, since April 2015, Wynn Resorts Ltd., a hospitality company, since April 2018, and SolarEdge, a solar technology company, since May 2021, as well as other private companies. Ms. Atkins previously served on the boards of Cognizant Technology Solutions, an information technology services company, from 2017 to 2018, Schneider Electric, an energy company, from April 2011 to April 2019, Covetrus, Inc. and its predecessor, Vets First Choice, a pharmaceutical company, from February 2016 until September 2019, HD Supply, Inc., an industrial distributor, from September 2013 to April 2018, and SunPower Corporation, a publicly-traded energy company, from August 2005 to August 2012. Ms. Atkins received a B.A. from the University of Massachusetts.
>
> We believe that Ms. Atkins is qualified to serve on our Board of Directors based on her public company board experience and corporate governance expertise.

45. According to Proxy Statements filed with the SEC, in fiscal years 2021, 2022, and 2023, Defendant Atkins received $86,115, $159,989, and $163,740 respectively in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 63,750 | 99,990 | 163,740 |
| **2022** | 60,000 | 99,989 | 159,989 |
| **2021** | 30,000 | 56,115 | 86,115 |

46. Defendant Pegah Ebrahimi ("Ebrahimi") has been a member of the Board since November 2021 and currently serves as a member of the Board's Audit Committee and the Nominating and Corporate Governance Committee.

47. The Company's 2024 Proxy Statement stated the following about Defendant Ebrahimi:

> **Pegah Ebrahimi**, age 44, has served as a member of our Board of Directors since November 2021 and previously served as a member of Legacy Enovix's Board of Directors from November 2021 to January 2023. Since February 2022, Ms. Ebrahimi has served as co-founder and managing director of FPV Ventures, an investment fund focused on investing in mission driven founders. From October 2019 to January 2021, Ms. Ebrahimi served as a board advisor of Gainsight Inc., a technology company, focused on software optimizing the customer experience and improving product analytics. From January 2019 to October 2020, she served as the chief operating officer of Cisco Collaboration at Cisco Systems Inc., a publicly-traded, multinational company, focused on designing and developing networking equipment and technology. From November 2013 to January 2019, she served as chief operating officer of Global Technology Banking at Morgan Stanley & Co. LLC, a multinational investment bank and financial services company, where she previously served as chief information officer of global investment banking from December 2009 to November 2013 and vice president investment banking from July 2008 to November 2009. From 2015 to May 2018, she served as an advisory board member of Accompany, Inc., a technology company, focused on designing and developing a relationship intelligence platform. Ms. Ebrahimi received a B.S. in Economics and Mathematics from the Massachusetts Institute of Technology.
>
> We believe that Ms. Ebrahimi is qualified to serve on our Board of Directors based on her go-to-market strategic expertise and leadership experience.

48. According to Proxy Statements filed with the SEC, in fiscal years 2021, 2022, and 2023, Defendant Ebrahimi received $9,162, $128,022, and $161,240 respectively in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 61,250 | 99,990 | 161,240 |
| **2022** | 66,662 | 61,360 | 128,022 |
| **2021** | 9,162 | - | 9,162 |

49. Defendant Bernard Gutmann ("Gutmann") has been a member of the Board since June 2023 and currently serves as the Chair of the Audit Committee.

50. The Company's 2024 Proxy Statement stated the following about Defendant Gutmann:

> **Bernard Gutmann**, age 64, has served as a member of our Board of Directors since June 2023. Mr. Gutmann brings close to forty years of experience in the semiconductor space. Most recently he served as the Executive Vice President and Chief Financial Officer & Treasurer of ON Semiconductor, a semiconductor manufacturing company, a position he held from September 2012 to February 2021. Prior to that, from 2006 to 2012, he served in the role of Vice President, Corporate Analysis & Strategy of SCI LLC, a wholly owned subsidiary of ON Semiconductor. From 1999 to 2002, he held the position of Director, Financial Planning & Analysis of SCI LLC. In these roles, his responsibilities have included finance integration, financial reporting, restructuring, tax, treasury and financial planning and analysis. Prior to joining ON Semiconductor, Mr. Gutmann served in various financial positions with Motorola, a consumer electronics company, from 1982 to 1999, including controller of various divisions and an off-shore wafer and backend factory, finance and accounting manager, financial planning manager and financial analyst. He holds a Bachelor of Science in Management Engineering from Worcester Polytechnic Institute in Massachusetts.
>
> We believe Mr. Gutmann is qualified to serve on our Board of Directors based on his executive and leadership experience and financial expertise.

51. According to the Proxy Statement filed with the SEC, in fiscal year 2023, Defendant Gutmann received $407,908 in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 33,000 | 374,978 | 407,978 |

52. Defendant Joseph Malchow ("Malchow") has been a member of the Board since June 2023 and currently serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.

53. The Company's 2024 Proxy Statement stated the following about Defendant Malchow:

> **Joseph Malchow**, age 38, has served as a member of our Board of Directors since June 2023. Since 2013, Mr. Malchow has served as the founding partner at HNVR Technology Investment Management, a venture capital firm based in Portola Valley, California. Mr. Malchow also serves on the board of Enphase Energy, Inc., a global energy technology company, where he has helped to architect a digital transformation to advance software-defined distributed clean energy systems. From January 2021 to January 2023, Mr. Malchow served on the board of Archaea Energy Inc., a leading producer of renewable gas. From December 2020 through July 2021, he served on the board of RSVAC. Mr. Malchow also serves as a member of the board of the National Civic Arts Society in Washington, D.C. and has a wide range of technical expertise, including scaled infrastructure, software-driven businesses, data security and machine learning. Mr. Malchow holds an A.B. from Dartmouth College and a J.D. from Stanford University.
>
> We believe that Mr. Malchow is qualified to serve on our Board of Directors based on his entrepreneurial, investment and leadership experience, and technical expertise.

54. According to the Proxy Statement filed with the SEC, in fiscal year 2023, Defendant Malchow received $408,728 in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 33,750 | 374,978 | 408,728 |

55. Defendant Gregory Reichow ("Reichow") has been a member of the Board since July 2021 and currently serves as Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Defendant Reichow is also named as a defendant in the Securities Action.

56. The Company's 2024 Proxy Statement stated the following about Defendant Reichow:

> **Gregory Reichow**, age 54, has served as a member of our Board of Directors since July 2021 and as a member of Legacy Enovix's Board of Directors from November 2020 to January 2023. Since July 2016, he has served as a partner at Eclipse Ventures, LLC, a venture capital firm. From June 2013 to July 2016, Mr. Reichow served as vice president, production (manufacturing, supply chain and automation engineering), at Tesla, Inc., an electric automobile manufacturer. From April 2011 to June 2013, he served as vice president of operations, powertrain, at Tesla. From November 2003 to April 2011, Mr. Reichow served as senior vice president of operations of SunPower Corporation, an energy company. From 1993 to 2003, he served various manufacturing and quality roles at Cypress Semiconductor Corporation, a semiconductor company. Mr. Reichow received a B.S. in Mechanical & Industrial Engineering from the University of Minnesota.
>
> We believe that Mr. Reichow is qualified to serve on our Board of Directors based on his executive and leadership experience and technical expertise.

57. According to Proxy Statements filed with the SEC, in fiscal years 2021, 2022, and 2023, Defendant Reichow received $83,615, $154,989, and $167,872 respectively in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 67,882 | 99,990 | 167,872 |
| **2022** | 55,000 | 99,989 | 154,989 |
| **2021** | 27,500 | 56,115 | 83,615 |

58. Defendant Harrold Rust ("Rust") co-founded the Company in 2006 and served as its CEO and President until December 29, 2022. Rust also served as Chairman of Enovix's Board prior to the Merger and continued as a member of the Board following the Merger until his retirement in January 2023. Defendant Rust is also named as a defendant in the Securities Action.

59. The Company's 2022 Proxy Statement stated the following about Defendant Rust:

> **Harrold J. Rust**, age 60, has served as our President and Chief Executive Officer and as a member of our Board of Directors since July 2021 and previously served as Legacy Enovix's President and Chief Executive Officer from November 2006, when he founded Legacy Enovix, to July 2021. Since July 2021, Mr. Rust has served as President and Chief Executive Officer and as a member of the Board of Directors of Enovix Operations Inc., a wholly owned subsidiary of Enovix Corporation. From April 2002 to September 2006, he served as vice president of FormFactor, Inc., a 3D material semiconductor testing company. Mr. Rust received a M.S. in Mechanical Engineering from Stanford University and a B.S.

> in Mechanical Engineering from the University of California, Davis. We believe that Mr. Rust is qualified to serve on our Board of Directors based on his experience as the founder of Enovix and his industry knowledge, as well as his leadership experience and technical expertise.

60. According to Proxy Statements filed with the SEC, in fiscal years 2021, 2022, and 2023, Defendant Rust received $6,093,656, $2,447,077, and $12,065,920 respectively in compensation from the Company.

| FISCAL YEAR | SALARY ($) | BONUS ($) | STOCK AWARDS ($) | OPTION AWARDS ($) | NON-EQUITY INCENTIVE PLAN COMPENSATION ($) | ALL OTHER COMPENSATION ($) | TOTAL ($) |
|---|---|---|---|---|---|---|---|
| **2023** | 107,377 | - | 733,777 | 9,966,500 | - | 1,258,266 | 12,065,920 |
| **2022** | 480,000 | - | 1,664,933 | 95,217 | 188,917 | 18,011 | 2,447,077 |
| **2021** | 338,536 | 180,000 | - | 5,560,515 | - | 14,605 | 6,093,656 |

61. Defendant Emmanuel T. Hernandez ("Hernandez") served as a member of the Board from July 2021 through October 2023, having previously held the position of CFO of RSVAC prior to the Merger. Defendant Hernandez is also named as a defendant in the Securities Action.

62. The Company's 2023 Proxy Statement stated the following about Defendant Hernandez:

> **Emmanuel T. Hernandez**, age 67, has served as a member of our Board of Directors since July 2021 and previously served as the Chief Financial Officer and a director of RSVAC from November 2020 to July 2021. From July 2021 until its merger with and into Enovix Corporation in January 2023, Mr. Hernandez served as a member of the Board of Directors of Enovix Operations, Inc. From February 2021 to February 2023, Mr. Hernandez served as a member of the Board of Directors of Ouster, Inc., a leading Lidar company, including as chairman of its audit committee. From November 2002 to March 2021, he served as a member of the Board of Directors of ON Semiconductor Corp, a transistor stalwart, including as chairman of its audit committee. From June 2017 to March 2022, Mr. Hernandez served as the chairman of the Board of Directors of BrainChip, Inc., a publicly-traded Australian artificial intelligence company. From 2004 to 2009, he was the chief financial officer of SunPower Corporation, an energy company. From 1993 to 2004, he was the executive vice president finance & administration and chief financial officer of Cypress Semiconductor Corporation, a semiconductor company. Prior to that, from 1976 to 1993, he held a series of positions at National Semiconductor, a pioneer Silicon Valley semiconductor company. From 2009 to 2017, he served on the boards of EnStorage Inc., formerly, an energy storage company, and SunEdison, Inc., a

> renewable energy company. He holds an MBA degree in Finance from Golden Gate University and a B.S. in accounting from the University of Nueva Caceres in the Philippines. We believe that Mr. Hernandez is qualified to serve on our Board of Directors based on his public company board experience and skills and expertise in strategy, finance and management.

63. According to Proxy Statements filed with the SEC, in fiscal years 2021 and 2022, Defendant Hernandez received $86,115 and $160,013 respectively in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2022** | 62,024 | 99,989 | 160,013 |
| **2021** | 30,000 | 56,115 | 86,115 |

64. Defendant John D. McCranie ("McCranie") was a member of the Board from July 2021 before resigning from the position in January 2023. He joined the Board again as a member in August 2023. Prior to his current term, McCranie served on the Board of Enovix Corporation and its predecessor entity from December 2020 until January 2023. Defendant McCranie is also named as a defendant in the Securities Action.

65. The Company's 2023 Proxy Statement stated the following about Defendant McCranie:

> **John D. McCranie**, age 78, has served as a member of our Board of Directors since July 2021 and previously served as a director of RSVAC from December 2020 to July 2021. Since November 2021, Mr. McCranie has served as a member of the Board of Directors of Enovix Operations, Inc. Since May 2018 and November 2019, Mr. McCranie has served as a board member and board chairman, respectively, of NexGen Power Systems, a power electronics company. After his early career in semiconductor sales, he became the executive vice president of sales & marketing for Harris Corporation, formerly, a technology company, and the chief executive officer of SEEQ Technology, formerly, a semiconductor company, and Virage Logic Corporation, formerly, a semiconductor company. From 1994 to 2001, he joined Cypress Semiconductor Corporation, a semiconductor company, as executive vice president of sales & marketing. He has held 10 board positions in the semiconductor industry, including having served on the board of Cypress Semiconductor Corporation, from June 2017 to May 2019, and ON Semiconductor Corporation, a semiconductor company, from 2001 to 2018. From 2012 to 2017, he served on the board of Mentor Graphics, an electric design automation company. He holds a B.S. in Electrical Engineering from Virginia Polytechnic Institute. We believe

> that Mr. McCranie is qualified to serve on our Board of Directors based on his public company board experience and his industry expertise.

66. According to Proxy Statements filed with the SEC, in fiscal years 2021, 2022, and 2023, Defendant McCranie received $84,685, $162,906, $3,425 respectively in compensation from the Company.

| FISCAL YEAR | FEES EARNED OR PAID IN CASH ($) | STOCK AWARDS ($) | TOTAL ($) |
|---|---|---|---|
| **2023** | 3,425 | - | 3,425 |
| **2022** | 62,917 | 99,989 | 162,906 |
| **2021** | 28,750 | 56,115 | 84,865 |

67. Defendant Steffan Pietzke ("Pietzke") served as the Company's CFO from July 2021 to July 2023, after which he continued with the Company as a consultant for the remainder of fiscal year 2023. Defendant Pietzke is also named as a defendant in the Securities Action.

68. The Company's 2023 Proxy Statement stated the following about Defendant Pietzke:

> **Steffen Pietzke**, age 51, has served as our Chief Financial Officer since July 2021 and has previously served as our Secretary from November 2022 to April 2023 and Legacy Enovix's Chief Financial Officer from April 2021 to July 2021. From March 2020 to March 2021, he served as Vice President, Finance and Chief Accounting Officer ("CAO") at ALX Oncology Holdings Inc., a clinical-stage immuno-oncology company. In March 2020, he served as Senior Vice President, Finance and CAO at Tricida, Inc., a pharmaceutical company, and he previously served as Tricida's Vice President, Finance and CAO from April 2018 to March 2020. From March 2017 to April 2018, he served as vice president, finance and chief accounting officer at PDL BioPharma, Inc., an acquirer of royalties and pharmaceutical assets, and he previously served as PDL BioPharma's controller and chief accounting officer from June 2015 to March 2017. From July 2013 to June 2015, he served as a senior manager with Ernst & Young LLP, a professional services firm. From April 2004 to June 2013, he served as a senior manager with PricewaterhouseCoopers LLP, a professional services firm, and he previously served as a senior associate with PricewaterhouseCoopers from September 2000 to April 2004. Mr. Pietzke received a B.S. in Accounting with honors from the University of Applied Sciences in Offenburg, Germany and is a certified public accountant.

69. According to Proxy Statements filed with the SEC, in fiscal years 2021, 2022, and 2023, Defendant Pietzke received $3,182,656, $7,650,175, $6,467,665 respectively in compensation from the Company.

70. Defendants Rodgers, Talluri, Atkins, Ebrahimi, Gutmann, Malchow, Reichow, Rust, Hernandez, McCranie, and Pietzke are collectively referred to herein as the "Individual Defendants."

71. During the Relevant Period, the Individual Defendants were actively engaged in managing the Company's operations at the highest levels and had access to confidential and proprietary information related to the Company's business, operations, services, markets, competition, sales, demand, backlog, and future business prospects. They also participated in drafting, producing, reviewing, and disseminating the allegedly false and misleading statements detailed herein. Furthermore, they were either aware of or recklessly disregarded the inaccuracies and misrepresentations made about the Company through public statements, representations, and filings and either approved or ratified these statements actively, or through inaction, thereby violating the federal securities laws.

72. As officers and controlling persons of a publicly traded company whose securities are registered with the SEC under the Exchange Act and listed on the Nasdaq, the Individual Defendants had a duty to promptly disclose truthful, accurate, and complete information regarding the Company's business, operations, services, markets, competition, sales, demand, backlog, and current and future business prospects. They were also obligated to correct any prior statements that were materially false or misleading to ensure that the market price of the Company's publicly traded shares reflected truthful, accurate and complete information. The Individual Defendants' false and misleading representations and omissions during the Relevant Period constituted a violation of these specific duties and obligations under the federal securities laws.

73. The Individual Defendants, by virtue of their positions of control and authority as officers and directors of the Company, exercised control over the content of the Company's SEC filings, press releases, and other public statements issued during the Relevant Period. Each Individual Defendant received copies of the documents alleged to be false and misleading before or shortly after their publication and had the ability and opportunity to prevent their issuance or ensure

their correction. As a result, each Individual Defendant bears responsibility for the accuracy of the public statements described herein and is therefore primarily liable for the representations contained within them.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

74. By reason of their positions as officers, directors, and/or fiduciaries of Enovix, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Enovix and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

75. The Individual Defendants were and are required to use their utmost ability to control and manage Enovix in a fair, just, honest, and equitable manner.

76. The Individual Defendants were and are required to act in furtherance of the best interests of Enovix and its shareholders to benefit all shareholders equitably.

77. Each director and officer of the Company owes Enovix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

78. As fiduciaries of Enovix, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their positions and authority.

79. The officers and directors of Enovix were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

80. Each Individual Defendant under their position as officers and directors of Enovix owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

81. As Enovix's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

82. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial

condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers and directors of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

83. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Verified Stockholder Derivative Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

84. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

(a) Ensure the Company's affairs were managed efficiently and in a business-like manner to achieve the highest quality performance;

(b) Ensure the Company operated diligently, honestly, and prudently, in full compliance with all applicable district and state laws, rules, regulations, and contractual obligations, and acted strictly within its legal authority;

(c) Ensure that communications with the public and shareholders were timely, complete, and made with candor; and

(d) Upon notice of issues concerning the Company's business practices or operations, act in good faith to take appropriate measures to correct the misconduct and prevent its recurrence.

85. Each of the Individual Defendants also bore a duty of loyalty to Enovix and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

86. During the pertinent times, the Individual Defendants served as agents for each other and for Enovix, always operating within the parameters of their agency.

87. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Enovix, were privy to detrimental, confidential information concerning the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

88. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this Verified Stockholder Derivative Complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

89. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

90. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

91. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as directors of Enovix, were direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this Verified Stockholder Derivative Complaint.

92. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of hir or her overall role in furthering the misconduct.

93. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Enovix, and at all times operated within the course and scope of that agency.

## ENOVIX CODE OF BUSINESS CONDUCT & ETHICS

94. The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Enovix's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

**Introduction**

We are committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics (the "Code") reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer and director to read and understand the Code and its application to the performance of his or her business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors.

* * *

**1. Honest & Ethical Conduct**

It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

* * *

**9. Maintenance of Corporate Books, Records, Documents & Accounts; Financial Integrity; Public Reporting**

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
- transactions be supported by appropriate documentation;
- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance and Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

## CORPORATE GOVERNANCE GUIDELINES

95. Enovix's Board also established the following guidelines for the conduct and operation of the Board.

* * *

***ROLE OF THE BOARD OF DIRECTORS***

Our stockholders select the Board to provide oversight of, and strategic guidance to, senior management. The core responsibility of a Board member is to fulfill his or her fiduciary duties of care and loyalty and otherwise to exercise his or her business judgment in the best interests of Enovix and our stockholders.

> Service on the Board requires significant time and attention on the part of directors. More specifically, the Board has responsibilities to review, approve and monitor fundamental financial and business strategies and major corporate actions, assess major risks facing Enovix and consider ways to address those risks, select and oversee management and determine its composition and oversee the establishment and maintenance of processes and conditions to maintain the integrity of Enovix. Directors must participate in Board meetings, review relevant materials, serve on committees and prepare for meetings and discussions with management. We expect directors to maintain an attitude of constructive involvement and oversight, to ask relevant, incisive and probing questions and to require honest and accurate answers. Directors must act with integrity and we expect them to demonstrate a commitment to Enovix, our values and our business and to long-term stockholder value.

## CHARTER OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

96. In addition to the duties enumerated above, under the Audit Committee Charter in effect during relevant times, Defendants Gutmann (Chair), Ebrahimi, and Malchow ("Audit Committee Defendants"') owed specific additional duties to Enovix. Specifically, the Audit Committee Charter states:

> **PURPOSE AND POLICY**
>
> The primary purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Enovix Corporation (the "Company") shall be to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, (ii) the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"), (iii) the performance of the Company's internal audit function, and (iv) the review of any reports or other disclosure required by the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein.
>
> The policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication between the Committee and the Auditors and the Company's financial management and internal auditors.
>
> * * *

**AUTHORITY**

The Committee shall have access to all books, records, facilities and personnel of the Company as deemed necessary or appropriate by any member of the Committee to discharge his 2 or her responsibilities hereunder. The Committee shall have authority to appoint, determine compensation for (at the Company's expense), retain and oversee the Auditors (as set forth in Section 10A(m)(2) of the Exchange Act, and the rules thereunder) and otherwise to fulfill its responsibilities under this charter. The Committee shall have authority to retain and determine compensation for, at the expense of the Company, special legal, accounting or other advisors or consultants as it deems necessary or appropriate in the performance of its duties. The Committee shall also have authority to pay, at the expense of the Company, ordinary administrative expenses (including expenditures for external resources) that, as determined by the Committee, are necessary or appropriate in carrying out its duties. The Committee shall have authority to require that any of the Company's personnel, counsel, accountants (including the Auditors) or investment bankers, or any other consultant or advisor to the Company attend any meeting of the Committee or meet with any member of the Committee or any of its special, outside legal, accounting or other, advisors or consultants.

* * *

**RESPONSIBILITIES**

The Committee's responsibility is one of oversight. The members of the Audit Committee are not employees of the Company, and they do not perform, or represent that they perform, the functions of management or the Auditors. The Committee relies on the expertise and knowledge of management and the Auditors in carrying out its oversight responsibilities. The management of the Company is responsible for preparing accurate and complete financial statements in accordance with generally accepted accounting principles ("GAAP"), preparing periodic reports and for establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The Auditors are responsible for auditing the Company's annual consolidated financial statements and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's quarterly financial statements. It is not the responsibility of the Committee to prepare or certify the Company's financial statements, guarantee the audits or reports of the Auditors or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP or otherwise comply with applicable laws.

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other

> registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and responsibilities with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock may be listed) deviate from these activities as appropriate under the circumstances:
>
> * * *
>
> **25) Ethical Compliance.** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics, including review and oversight of related-party transactions as required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock is listed.
>
> * * *
>
> **26) Proxy Report.** To oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.
>
> * * *
>
> **31) Report to Board.** To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

## FACTUAL BACKGROUND

97. RSVAC was a publicly listed special purpose acquisition company ("SPAC"), commonly referred to as a "blank check" entity. A SPAC is a publicly traded shell corporation formed with the exclusive objective of acquiring a privately held company. Pursuant to its initial registration statement, RSVAC was organized in September 2020 "for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities."

98. RSVAC's initial registration statement declared that "given the experience of our management team, our acquisition and value creation strategy will be to identify, acquire, and build a Silicon Valley-based technology company with applications in the energy or industrial sectors."

99. On December 4, 2020, RSVAC completed its initial public offering ("IPO"), issuing 23 million "Units" at $10.00 per Unit. Each Unit consisted of one share of RSVAC common stock and one-half of a redeemable warrant, with a full warrant conferring the right to purchase one share of RSVAC common stock at an exercise price of $11.50. Prior to the consummation of the Merger, RSVAC's common stock, Units, and warrants were listed and traded on Nasdaq under the ticker symbols "RSVA," "RSVAU," and "RSVAW," respectively. The IPO yielded gross proceeds of $230 million, which were deposited into a trust account designated for the redemption of shares or, upon completion of a qualifying business combination, for the infusion of capital into the acquired operating entity.

100. As Chairman and CEO of RSVAC, Defendant Rodgers had a substantial pecuniary interest in identifying and consummating a transaction with a target company and in sustaining the post-merger market value of the company's securities. On September 24, 2020, RSVAC issued 5,750,000 shares of common stock (the "Founder Shares") to Rodgers Capital LLC, an entity under Rodgers' control, for an aggregate consideration of $25,000. Rodgers agreed to restrictions on transfer, prohibiting disposition of the Founder Shares until the earlier of: (a) one year following the completion of a "Business Combination" (including the Merger) or (b) subsequent to a Business Combination, if the last reported sale price of the company's common stock equaled or exceeded $14.00 per share for any 20 trading days within a 30-trading day period commencing no earlier than 150 days after such Business Combination. At a price of $14 per share, Rodgers stood to realize approximately $80 million upon sale of those shares.

101. By December 2020, RSVAC had identified Enovix as one of ten potential acquisition candidates. The RSVAC Board determined that Enovix satisfied most of its stated criteria and represented the most favorable prospect for a business combination. As disclosed in the Proxy Statement (defined below), the RSVAC Board undertook extensive due diligence with Enovix senior management and personnel between December 16, 2020, and February 11, 2021, including weekly

sessions to monitor and evaluate progress. According to the Proxy Statement, prior to reaching its determination, "the RSVAC Board of Directors discussed the material results of its due diligence activities with respect to Enovix, which included extensive meetings and calls and detailed review of: … factory configuration, capacity utilization models, throughput of the factory, the level of automation, yields, manpower plans and detailed cost models…."

102. On February 22, 2021, RSVAC and Enovix entered into a definitive merger agreement effectuating what is commonly referred to as a "de-SPAC" transaction. The press release announcing the Merger stated that the transaction was anticipated to close during the second quarter of 2021.

103. On June 24, 2021, the Company issued a combined Proxy Statement and Prospectus soliciting shareholder approval of the Merger between RSVAC and Enovix, together with related proposals (the "Proxy Statement"). On that same date, the Company filed the Proxy Statement with the SEC on Form 424B3. The Proxy Statement was incorporated into and constituted a component of a Registration Statement filed by RSVAC with the SEC on Form S-4. The Registration Statement was initially filed on March 8, 2021, and, following multiple amendments, was declared effective on June 24, 2021. The Registration Statement was executed by Defendants Rodgers, Hernandez, McCranie, and Malchow.

104. The Proxy Statement represented that "the disinterested members of the board of directors of RSVAC [*i.e.*, excluding Rodgers] have unanimously approved and adopted the Merger Agreement and the transactions contemplated therein and unanimously recommends that RSVAC stockholders vote 'FOR' adoption and approval of the Business Combination Proposal, 'FOR' the Nasdaq Proposal, 'FOR' the Directors Proposal, 'FOR' the Charter Amendment Proposal, 'FOR' the Advisory Proposals and 'FOR' the Incentive Plan Proposals presented to RSVAC stockholders in this proxy statement/prospectus, and 'FOR' the Adjournment Proposal, if presented."

105. Following dissemination of the Proxy Statement, RSVAC's stockholders approved the de-SPAC Merger with Enovix at a special meeting convened on July 12, 2021.

106. The Merger was consummated through the merger of an RSVAC subsidiary with and into pre-Merger Enovix, with Enovix surviving as a wholly owned subsidiary of RSVAC. Upon

completion of the Merger, RSVAC adopted the name Enovix Corporation, and pre-Merger Enovix was renamed Enovix Operations Inc. Each outstanding share of pre-Merger Enovix common stock was converted into the right to receive shares of the Company's common stock at the conversion ratio specified in the Merger Agreement, and all outstanding warrants and options to purchase pre-Merger Enovix common stock were converted into warrants and options to purchase shares of post-Merger Enovix common stock, as provided in the Merger Agreement.

107. Prior to the consummation of the Merger, RSVAC's shareholders retained the right to redeem their shares for a *pro rata* distribution of the trust account funds, which amounted to approximately $10 per share at the time of closing. The Merger was completed on July 14, 2021, with the Company's common stock trading at slightly above $20 per share.

108. Simultaneously with the execution of the Merger Agreement, RSVAC entered into a Private Investment in Public Equity ("PIPE") financing arrangement, pursuant to which RSVAC agreed to issue and sell, in a private placement scheduled to close immediately prior to the Merger, 12.5 million shares of RSVAC common stock at $14.00 per share, generating aggregate proceeds of $175 million.

109. As a result, the combination of SPAC trust funds (to be contributed to the post-Merger entity) and PIPE financing provided Enovix with an aggregate cash infusion of approximately $405 million, capital that was essential to fund Enovix's ongoing operations and the expansion of its manufacturing infrastructure.

110. As the Proxy Statement stated:

> Enovix has incurred losses since inception and has an accumulated deficit of $223.4 million. These conditions raise substantial doubt about Enovix's ability to continue as a going concern. The ability to continue as a going concern is dependent upon generating profitable operations in the future and/or obtaining the necessary financing to meet Enovix's obligations and repay its liabilities arising from normal business operations when they become due. Enovix believes that the successful completion of the Business Combination will eliminate this doubt and enable Enovix to continue as a going concern.

111. Enovix is an emerging technology company engaged in the design and manufacture of an innovative class of Li-ion batteries, represented as being more compact and durable than conventional Li-ion batteries. This advancement is achieved through the incorporation of silicon

anodes and a proprietary three-dimensional stacking architecture, which Enovix asserts enhances energy density and supports the maintenance of extended cycle life.

112. Enovix asserted that its next-generation Li-ion battery possesses a longer lifespan than conventional Li-ion batteries and is purportedly five years ahead of current industry production capabilities.[3] Specifically, by incorporating a silicon anode and employing a proprietary three-dimensional cell architecture, Enovix claimed it could manufacture Li-ion batteries with an energy density increase ranging from 27% to 110%, as measured by battery power (in watts) and physical volume. In essence, Enovix represented that it could produce a smaller, more robust Li-ion battery.

113. Enovix commenced development of its technology in early 2007 at a modest facility in Fremont, California. In 2012, the Company relocated to a larger Fremont facility and initiated work on its manufacturing methodology and product plans. Between 2012 and 2017, Enovix acquired and installed pilot production equipment capable of producing limited quantities of Li-ion batteries for distribution as samples to prospective customers, though not at commercially viable volumes.

114. According to the Proxy Statement, at the time of the Merger, Enovix was "a development stage company that has no product revenue to date and has incurred a net loss of $39.7 million for the year ended December 31, 2020 and $16.2 million for the period ended March 31, 2021. As of March 31, 2021, [Enovix] had an accumulated deficit of $223.4 million." Enovix required external financing to sustain its operations and needed to construct and scale its manufacturing capabilities to achieve sustainable revenue generation through battery sales.

115. Upon announcement of the Merger, Enovix articulated an "ambitious goal" to establish a U.S.-based manufacturing line and commence product deliveries to customers, thereby generating its initial product revenue, by the second quarter of 2022. In February 2021, Enovix informed investors of the manufacturing output rate required to achieve its projected revenue targets.

[3] Pursuant to the representations set forth in the Proxy Statement, and predicated upon "a 30-year Li-ion battery industry trajectory of modest (4.36%) annual Li-ion battery energy density improvements… and Enovix's estimated greater energy density of at least 27%," it is asserted that "it would require five years for the industry to reach energy densities equivalent to Enovix's current batteries."

Specifically, Enovix estimated that production would need to occur at a pace of one battery every two seconds, necessitating four manufacturing lines, each capable of achieving 550 units per hour ("UPH").

116. Enovix's CEO, Defendant Rust, emphasized the critical importance of manufacturing at the time the Company became publicly traded. In a press release dated July 14, 2021, Rust stated that Enovix was "focused on producing the first advanced silicon-anode lithium-ion battery for mass market applications from our U.S. manufacturing facility." Defendant Rodgers further asserted: "We believe that Enovix will be the first to deliver at scale due to its proprietary 3D cell architecture, world-class team and automated manufacturing. With five design wins with major technology leaders, Enovix is years ahead of other battery companies. Even better, it has a plan to maintain that lead."

117. Although Enovix had previously produced and delivered sample batteries utilizing its pilot production line, that line was capable of manufacturing only approximately 20 batteries per day—far below the volume required to support commercial sales operations. Accordingly, construction of a commercial-scale production facility was essential to achieving production at commercially viable levels and meeting revenue projections.

118. Enovix intended to market its next-generation battery to Original Equipment Manufacturers ("OEMs"), who would integrate the battery into consumer electronics such as smartwatches, virtual reality headsets, laptop computers, mobile phones, and electric vehicles. To realize these sales and monetize its proprietary technology, Enovix needed to demonstrate the ability to manufacture its batteries at sufficient scale to meet customer demand. In the Company's own words, it sought to "evolve from a company focused predominantly on R&D to a company capable of volume production and commercialization."

119. To sell its new Li-ion batteries, Enovix was required to obtain "qualification" from OEMs. The qualification process involved OEMs testing the newly designed batteries within their own consumer products to confirm functionality as represented. Only upon successful qualification would OEMs design their products to incorporate the new batteries. However, prior to committing to product integration, OEMs required assurance that Enovix could consistently manufacture high-

quality batteries in quantities sufficient to meet their production requirements. If Enovix could demonstrate such capability, OEMs would issue purchase orders commensurate with large-scale consumer product manufacturing.

120. For instance, if a smartwatch manufacturer sought to integrate Enovix's new batteries into its devices, it might undertake a redesign of its watches to accommodate the new battery specifications. Prior to committing to such an investment, the manufacturer would require assurance that Enovix could reliably produce sufficient quantities of batteries within the necessary timeframe to meet its production schedule. Thus, if the smartwatch manufacturer intended to produce one million units incorporating Enovix's batteries, it would need confirmation that Enovix could consistently and timely supply one million commercial-grade batteries. Absent such assurance, the manufacturer would not allocate resources to redesign its products for compatibility with Enovix's batteries.

121. Before an OEM would "qualify" Enovix's new Li-ion battery, Enovix was required to furnish batteries manufactured on the same production line designated for fulfilling the customer's order, rather than from its pilot line. Additionally, Enovix needed to demonstrate that the manufacturing facility intended for order fulfillment could produce sufficient quantities of batteries to satisfy the customer's purchase order within the agreed timeframe. Consequently, Enovix was obligated to establish a fully operational manufacturing line meeting mass-production specifications prior to generating revenue from product sales and achieving its financial projections.

122. An initial step involved demonstrating to the customer that the Fab-1 line could manufacture a batch of batteries conforming to the customer's unique design specifications. A subsequent stage required scaling production to validate Enovix's ability to produce large volumes of batteries meeting those specifications. For example, during this high-volume qualification phase, a customer might request Enovix to manufacture 10,000 or 20,000 batteries by a specified date, which the customer would then test to ensure compliance with its requirements.

123. Manufacturing a newly designed product, such as an advanced battery that has never previously been produced, is an inherently complex undertaking because it necessitates custom-engineered manufacturing equipment. Such bespoke equipment, designed and fabricated by

engineers at equipment vendors, presents numerous opportunities for defects or operational errors. To mitigate these risks, purchasers of newly designed manufacturing equipment typically implement EPR protocols, which incorporate two critical quality control assessments: the FAT and the SAT. These evaluations are intended to confirm that the equipment satisfies performance requirements and to reduce the substantial risk of nonconformance.

124. The FAT is conducted offsite at the equipment vendor's facility to verify that the equipment is properly designed, functions as intended, and meets the purchaser's specifications. To execute the FAT, the equipment is assembled at the vendor's factory and tested pursuant to a detailed inspection plan mutually agreed upon by the purchaser and the vendor.

125. According to the operative complaint of the Securities Action (the "Second Amended Complaint," or the "SAC"), a former Company employee confirmed that, in a standard FAT, the purchaser dispatches its engineers to the vendor's facility to participate in testing and ensure compliance with agreed specifications. This collaborative process enables the vendor's engineers to provide direct technical guidance to the purchaser's engineers regarding equipment functionality. According to that former employee, if the equipment fails to meet the contractual FAT specifications, it is not shipped to the purchaser. *Id*.

126. The primary objective of the FAT is to confirm that the equipment can operate at the speed and quality levels necessary to satisfy the purchaser's production requirements. If deficiencies are identified during FAT, they can be remedied more efficiently and cost-effectively at the vendor's facility. Conversely, once the equipment is shipped and installed at the purchaser's site, corrective measures become significantly more time-consuming, expensive, and complex. Conducting the FAT substantially reduces the risk of equipment underperformance and facilitates pre-installation troubleshooting.

127. The initial step in the FAT process involves preparation of a written plan detailing all purchaser specifications and the performance standards required to meet expectations. The parties agree upon an inspection protocol and testing procedures. Manufacturing data is recorded by the vendor to verify compliance with purchaser specifications, and such data is provided to the purchaser for review.

128. Also according to the SAC, former employees of Enovix confirmed that the specific parameters governing the FAT are established at the time the purchase agreement is negotiated between the equipment purchaser and the vendor. According to one former employee, the criteria defining the scope of testing to be conducted during both the FAT and the SAT are generally agreed upon approximately one year prior to the execution of such tests. Although modifications to the agreed-upon criteria are possible, any such changes must be mutually negotiated and approved by the purchaser and the vendor. The FAT is conducted after the vendor has completed the manufacture and assembly of the equipment and is intended to demonstrate that the machinery performs in accordance with the specifications set forth in the purchase contract.

129. The SAT constitutes the subsequent critical quality control procedure. It serves to verify that the performance demonstrated during the FAT can be replicated once the equipment is installed and configured at the customer's facility. Because the operating conditions at the vendor's facility typically differ from those at the customer's site, the SAT requires the equipment to operate under actual production conditions at the customer's facility.

130. To perform the SAT, the equipment vendor dispatches representatives—typically the same engineers who designed the system and conducted the FAT—to install the equipment, configure the system, conduct the requisite testing, and confirm proper operation. The SAT is intended to ensure that the equipment has been correctly installed, is properly integrated with the customer's supporting systems, including computer networks, and continues to meet the customer's performance specifications. If production or quality deficiencies are identified during the SAT after the equipment has passed the FAT, responsibility for remediation rests with the equipment vendor.

131. According to the SAC, a former employee explained that, within the manufacturing industry, the conduct of both the FAT and the SAT constitutes "all risk mitigation." That former employee further confirmed that, with respect to the FAT, "you want to test [new manufacturing equipment] at the factory because it's cheaper to fix it at the factory than at your site," and that, with respect to the SAT, testing the equipment upon delivery to confirm proper operation "is easier to do before the integrators (suppliers) go home." As that former employee summarized, "if you skip the tests (FAT and SAT), you're not mitigating the risks."

132. The FAT and SAT were of particular significance for Enovix's Fab-1 equipment because Enovix intended to sell its batteries to OEMs. Prior to an OEM entering into a sales contract with Enovix, the Company was required to demonstrate, through a formal qualification process, its ability to manufacture batteries at high volume in accordance with the OEM's specifications. Such high-volume production was required to occur on the actual production line designated to fulfill the OEM's order, rather than on a pilot line. Accordingly, before Enovix's production line could be commissioned and operated, particularly at the volumes necessary to complete the qualification process, it was required to successfully pass both the FAT and the SAT. Consequently, the successful completion of the FAT and SAT constituted critical milestone events for Enovix in its progression toward generating revenue from product sales and achieving its projected financial performance.

133. Per the Proxy Statement, Enovix began procuring equipment for its first production facility, Fab-1, in 2020. To acquire the manufacturing equipment necessary to outfit the Fab-1 facility, Enovix entered into contracts with vendors that assisted in the design and manufacture of custom production equipment.

134. The Fab-1 production lines consisted of four distinct "areas" in which different stages of the battery manufacturing process would occur: Electrode Fabrication, Assembly, Packaging, and Testing and Formation. Each of these areas was essential to the overall manufacturing process, such that all production areas were required to operate at full capacity in order for Fab-1 to produce batteries of acceptable quality at the specified production rates.

135. According to the SAC, a former employee of the Company confirmed that a substantial portion of the Fab-1 equipment, specifically, the critical portions of the production lines used for battery Assembly and Packaging, was outsourced to Yinghe, which is located in Huizhou, Guangdong Province, China.

136. That same former employee, according to the SAC, reported that Enovix had an EPR in place with Yinghe well before the equipment was shipped from Yinghe to Enovix. Based on that former employee's general familiarity with EPRs within the industry, he concluded that his supervisor, Enovix's Senior Director of Procurement, Tae Chang, likely drafted the EPR for the

Yinghe equipment and that "the entire C-suite" at Enovix would have been involved in approving it.

137. As that former employee explained, an EPR is a document that authorizes funding for the purchase of equipment from a vendor and sets forth the parameters that must be satisfied in order to finalize the purchase agreement, including requirements that the equipment successfully pass the FAT and the SAT. If the equipment is unable to pass the FAT, it is not shipped to the customer's site for the SAT, as the primary purpose of the SAT is to demonstrate that the equipment (having passed the FAT) can continue to perform in accordance with specifications after being disassembled, transported to the customer's facility, and reassembled.

138. OEE is an industry-standard metric used to measure production efficiency by identifying the percentage of manufacturing time that is genuinely productive. OEE is calculated as the product of three measurable components: Availability, Performance, and Quality. An OEE of 100% indicates that only non-defective products are produced (100% quality), at maximum speed (100% performance), and without interruption (100% availability). OEE is universally recognized as a critical key performance indicator, or "KPI," across manufacturing industries, and its measurement is a manufacturing best practice that provides insight into systematic process improvements.

139. Also according to the SAC, a former employee explained that the primary parameter governing the FAT and SAT for the Fab-1 equipment was capacity, specifically the number of units the equipment could produce per hour ("UPH").

140. That is when Defendants Rust and Rodgers decided to secretly waive the requirement that the equipment successfully pass the FAT and instead arranged for the equipment to be airlifted to Fremont. In April 2021, Rust contacted Rodgers and proposed transporting the Yinghe equipment from China to Fremont by air in order to avoid a potential three-month delay caused by global shipping backlogs, at a cost of approximately $1.4 million to charter the world's largest airplane for that purpose. Rodgers approved the plan.

141. A September 2021 article published by *FreightWaves*, a transportation industry publication, detailed the airlift operation authorized by Defendants Rodgers and Rust, stating that

"[a]fter undergoing extensive testing at factories in Asia, the equipment was partially disassembled and carefully packed into 60 shipping crates before being loaded on the An-124, which delivered it to San Francisco International Airport on a Sunday in late April."[4]

142. As Rodgers later acknowledged in November 2022:

> Our decision [to airlift the Fab-1 equipment from China] violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later. The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors.

143. Stated differently, to facilitate the shipment of the equipment from Yinghe's manufacturing facility in China to Enovix's Fab-1 facility in Fremont, Rust and Rodgers knowingly waived the requirement set forth in Enovix's EPR that the Yinghe equipment, despite having repeatedly failed the FAT during the preceding six months, successfully complete and pass the FAT in China prior to Enovix's authorization of shipment and acceptance of delivery.

144. As Rodgers himself acknowledged, Enovix's EPR governing the Yinghe equipment required that the FAT "required that a team of Enovix engineers fly to multiple Chinese factories [including Yinghe's], and personally observe each piece of Fab-1 equipment running at full speed." At all relevant times, however, Enovix engineers were prohibited from traveling to China and therefore were unable to personally observe any testing of the Fab-1 equipment at Yinghe's facility. Rust and Rodgers were thus aware that the FAT was never conducted in accordance with the procedures mandated by Enovix's own EPR.

145. Further, even aside from the EPR's requirement that Enovix engineers be physically present at Yinghe's facility, the EPR independently required that the equipment operate "at full speed before [Enovix] approved shipment." Rust and Rodgers waived this requirement as well. The

[4] Kulisch, Eric, "Lithium battery maker airlifts assembly line to leapfrog port congestion," *FreightWaves*, *available at* https://www.freightwaves.com/news/lithium-battery-maker-airlifts assembly-line-to-leapfrog-port-congestion.

equipment never achieved full-speed operation consistent with Enovix's specifications, whether or not Enovix personnel were present in China. Accordingly, the Fab-1 equipment never passed the FAT prior to Enovix taking delivery.

146. According to the SAC, former employees confirmed that COVID-19 travel restrictions had prevented Enovix employees from traveling to China to participate in the FAT. As one of those former employees explained, "if we had been able to do the FAT, we would have found out these [production performance problems] sooner. But we didn't, so we didn't stumble across them until later, and we had to try to bring them up to specification" at Fremont.

147. During this same timeframe, approximately 20 to 30 members of Enovix's management and senior leadership convened each weekday at 9:00 a.m. to address the ongoing operational challenges affecting the Fab-1 production lines. According to the SAC, Defendant Rust was present approximately 80% of the time, with Enovix's CFO, Defendant Pietzke, attending on occasion. At these meetings, senior engineering and operations personnel provided Defendant Rust and other members of management with updates regarding the status of the Fab-1 production lines.

148. Also according to the SAC, one former employee explained that written status reports were circulated during the daily meetings outlining the production issues confronting Fab-1, including discussions of "where the bottle neck is, what the problem is, what's going on that day," as well as "projections for output" for both the current day and future periods. That former employee similarly stated that the daily meetings consistently included reports of Fab-1 production metrics, comparisons between targeted and actual production from the prior day, and discussions regarding ongoing efforts to bring the Fab-1 equipment into compliance with performance specifications.

149. According to a former employee, also described in the SAC, any individual who attended the daily meetings would have been aware that Fab-1 was experiencing significant difficulties achieving an acceptable yield of quality batteries, including Defendant Rust. Another former employee, as described in the SAC, confirmed that all attendees understood that the Fab-1 equipment was not performing in accordance with specifications, stating that "everyone was concerned" and that "it was common knowledge we weren't meeting the output requirements and quality requirements."

150. According to the SAC, a former employee reported that Fab-1 production data, including UPH metrics, were readily available at all times because the Fab-1 machinery automatically generated such information through automated reporting systems. According to that former employee, Enovix maintained a "whole data pipeline set up to look at the number of batteries made and quality of the batteries," including multiple dashboards reflecting this information. He further explained that "everyone" at Enovix had access to these production reports.

151. Another former employee, according to the SAC, further reported that both he and his direct supervisor were hired by Enovix specifically to scale the Fab-1 line to full commercial manufacturing volume because, when he joined Enovix in October 2021, the Fab-1 line "was not producing." By the time he departed Enovix in November 2022, the Fab-1 line remained incapable of producing at the levels required by the Company. As he described, although "there was progress" in improving Fab-1's manufacturing capacity during his tenure, such progress was "not substantial enough to meet the needs of what was proposed" by Enovix.

152. As a former employee reported pursuant to the SAC, by June 2022 the machinery in the Fab-1 area in which he worked, namely, the Assembly area containing equipment supplied by Yinghe, was operating at less than 10% of its anticipated production capacity. Although the Assembly equipment was originally specified by Enovix to produce approximately 550 batteries per hour, by June 2022 it was producing only 30 to 40 batteries per hour, representing approximately 5–7% of the specified 550 UPH. According to that former employee, by December 2022 Enovix had increased output in that area to approximately 100 batteries per hour, or roughly 18% of the specified capacity; however, this remained, in his words, a "far cry" from the original specifications. Based on his experience working for several months in the latter half of 2022 to improve Fab-1's production capacity, that former employee estimated that the manufacturing equipment would never be capable of producing more than approximately 200 UPH, about 36% of the specified 550 UPH, even if all proposed improvements were successfully implemented.

153. According to former employees as described in the SAC, even after approximately one year of coordinated efforts by Enovix and Yinghe engineers in Fremont, the equipment still failed to satisfy the SAT requirements because it never achieved production levels consistent with

Enovix's specifications. One such former employee characterized the equipment procured from Yinghe as "a piece of junk" and stated that "obviously, the specs in place for the EPR were never met." He further reported that the equipment was never capable of producing more than approximately 100 UPH, which was substantially below Enovix's stated requirements.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

154. On August 10, 2021, Enovix released its first "Letter to Our Shareholders," which described the Company's operations and financial results for the second quarter of 2021. The letter was filed as an exhibit to a Current Report on Form 8-K submitted to the SEC. Defendants Rust and Pietzke signed the letter, and Pietzke also executed the Form 8-K.

155. The August 10, 2021 "Letter to Our Shareholders" stated in pertinent part:

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …
>
> With the equipment for Line 1 installed, our factory is now undergoing qualification. ***The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery. …***

156. The statement above is false and misleading because the Individual Defendants knowingly or recklessly made, or approved, the statement while failing to disclose material facts, including: (i) that the Fab-1 equipment supplied by Yinghe never achieved performance in accordance with specifications despite several months of factory acceptance testing in China; (ii) that the Company had affirmatively waived the requirement that the equipment pass the FAT prior to taking delivery, including that such waiver enabled the decision to transport the equipment from China by air; and (iii) that, even after months of on-site testing in California, the equipment remained far from meeting Enovix's required performance specifications. Consequently, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

157. Notably, Judge Illston found that "[b]ecause the FAT by definition is to be conducted *at the vendor's factory*, by the time the equipment arrived in California in late April 2021, there was no way for the equipment to pass the FAT at that point." Order at 11 (emphasis in original) (internal

citations excluded). Judge Illston elaborated that "if the equipment never passed the FAT, it was false and misleading for Enovix to state that the site acceptance test would 'confirm' the equipment was meeting performance requirements and to state the FAT was 'already performed' without revealing that the equipment had failed the FAT." *Id*. at 12.

**THE TRUTH FINALLY EMERGES**

158. The Individual Defendants' false and misleading statements and omissions concerning Fab-1, as described above, concealed material facts demonstrating that Fab-1 was repeatedly failing to achieve required production capacity and quality specifications, thereby preventing the Company from generating its first meaningful revenue from the commercial manufacture and sale of its batteries. Those concealed facts were gradually revealed through a series of partial disclosures beginning in late 2022, which exposed significant delays in production and projected revenue timelines, the deficiencies of the Fab-1 equipment, and ultimately led to the Company's abandonment of Fab-1 as a commercial production facility. As these previously undisclosed risks materialized and the truth emerged, Enovix's stock price declined precipitously, causing substantial losses to investors.

159. During the second half of 2022, Enovix began to make incremental disclosures indicating that the ongoing setbacks affecting the Fab-1 manufacturing equipment had not only delayed the Company's ability to recognize material product revenue by the second quarter of 2022, but had also postponed the development of Enovix's next generation of manufacturing equipment, which had been intended to build upon the anticipated success of the original Fab-1 production line.

160. In August 2022, Enovix announced that it had achieved its stated objective of recognizing initial product revenue by the second quarter of 2022, reporting $5.1 million in revenue for the quarter. However, virtually none of that revenue was derived from the delivery of products to customers. Instead, $5.0 million of the reported $5.1 million (approximately 98%) was attributable to the completion of early-stage work under a product development program for a single customer and was classified as "service revenue," rather than revenue from product sales.

161. At the same time, the Individual Defendants made generalized acknowledgments that the Company would need to "increase our manufacturing yield metrics." To that end, and

purportedly to "prioritize Fab-1 improvements in the third quarter" of 2022, the Individual Defendants announced that they would be "taking the line down for portions of the quarter to improve individual process modules and install planned battery conveyance." The Individual Defendants represented that their "goal" was to "do the needed work in Q3 to position us for the start of our production ramp to close the year." Defendant Rust further assured investors that Fab-1 would be "the workhorse of our output next year" and that the anticipated revenue "ramp" would begin in the fourth quarter of 2022 following completion of the purported "improvements" to Fab-1.

162. Rather than disclosing the reality that the Company had failed to come anywhere close to achieving the capacity and quality requirements necessary for commercial-scale production, despite nearly two years of continued efforts and repeated failed testing by Yinghe and Enovix engineers, these statements merely referenced vague "improvements" to the Fab-1 line. Those statements suggested only limited operational interruptions affecting "portions of the quarter" and implied a modest delay to the anticipated revenue ramp later that same year.

163. On November 1, 2022, after the close of market trading, Enovix issued its Letter to Our Shareholders for the third quarter of 2022. The letter disclosed that the Company generated only $8,000 in revenue during the quarter. It further explained that this revenue resulted from "a modest number of batteries shipped to customers for qualification programs and pre-production and end-product builds." In reality, Enovix was not manufacturing or delivering batteries on a commercial scale; instead, "[t]he majority of batteries shipped during the quarter were samples that did not generate revenue."

164. Although the November 1, 2022 letter did not fully disclose the nature or scope of the Company's manufacturing difficulties, it cryptically acknowledged that the "improvements" for which Enovix had partially shut down Fab-1 were proceeding "slower-than-expected," and revealed that the Company had undertaken a significant strategic pivot—shifting its focus away from maximizing output from the existing Fab-1 production lines and toward prioritizing the development of its next-generation manufacturing lines to be deployed in future planned production facilities:

> As we highlighted in last quarter's Shareholder Letter, we made a conscious decision to focus on manufacturing improvements over shipments in Fab-1 during the third quarter. … Given the wide gap in expected performance between our

> Gen1 and Gen2 and the slower-than expected improvements on our Gen1 manufacturing equipment, we have now concluded that the incremental effort necessary to drive higher throughput on Gen1 technology is better spent on the critical yield and productivity learning necessary for a strong launch of our Gen2 Autoline. ***As a result, we are dialing back Gen1 throughput enhancement activities and anticipate achieving lower overall output from Fab-1 in 2023 in favor of focusing on the Gen2 Autoline, which is the engine for our future scaling.***

165. The November 1, 2022 letter further disclosed that the Company's total projected production run rate for 2023 would be fewer than one million battery cells, representing less than 10% of the output that would have been achieved had Enovix been producing batteries at the originally specified rate of one battery every two seconds:

> In the third quarter, we worked to optimize our first production line ("Line 1") in Fab-1 for higher yield and throughput, bring up our second production line in Fab-1 ("Line 2"), and complete our learnings for Gen2. ***We expect Fab-1 improvement activities to extend into 2023, but at a slower rate given the decision to redirect resources to Gen2. Given this, we expect to exit 2023 at a run rate of under one million battery cells produced from the Gen1 equipment at Fab-1.***

166. The disclosure that Fab-1 would generate substantially lower output in 2023, coupled with the Company's announcement that it would "redirect resources" toward its Gen2 manufacturing lines, abruptly and materially altered investors' understanding of the timeline for Enovix to commercialize its batteries and generate revenue. As Enovix's Chief Commercial Officer ("CCO"), Cameron Dales, explained at the Cowen Global Transportation & Sustainable Mobility Conference, supplying batteries to OEM customers involves a multi-stage qualification process requiring extensive testing, noting that "there's a multiyear process of just qualifying the technology to make sure that the technology really works." Although Enovix had cleared certain qualification hurdles using batteries produced on its Gen1 Fab-1 lines, abandoning the Gen1 lines in favor of newly designed and unproven Gen2 lines effectively reset the qualification process and required the Company to restart that timeline.

167. The November 1, 2022 letter further informed investors that "[w]e expect that certain customers may require up to several months to qualify the Gen2 line before accepting product that

is manufactured on that line." At the same time, Enovix did not anticipate receiving the new manufacturing equipment for its Gen2 lines until the second half of 2023.

168. Following these disclosures, Enovix's stock price declined sharply, falling approximately 41% from a closing price of $17.99 per share on November 1, 2022 to $10.53 per share at the close of trading on November 2, 2022, on unusually heavy trading volume.

169. On November 2, 2022, an article published on the widely followed investment website *Motley Fool*, titled "Why Enovix Stock Plunged Today," explained that investors "weren't expecting an announcement the company will put more effort into Gen2 technology over improving Gen1 technology. This likely means that revenue scaling will take longer than expected." The article further noted that "management said that Gen2 production is expected to start in late 2023 at best. This means the company will need to survive on the $349 million in cash on the balance sheet until then, which may be a stretch. The company has used over $91 million in cash in the first three quarters of the year and will spend more on installing capacity next year."

170. However, the November 1, 2022 letter did not fully disclose to the market the magnitude of the previously concealed risks—namely, the Company's ongoing inability to achieve anything approaching commercial-scale production capacity or required quality standards using its heavily promoted Fab-1 equipment. The Individual Defendants further continued to make statements that were misleading with respect to the status and performance of Fab-1.

171. On the morning of November 7, 2022, Enovix announced via press release that Defendant Rodgers would assume a new role as Executive Chairman, with increased direct involvement in the Company's operations. In a statement issued the same day, Rodgers acknowledged to investors that "***We have poorly communicated on the status of Fab-1***," and further explained:

> [W]e lowered our 2023 revenue projection in a confusing manner that erroneously implied that there were bigger problems with our technology. Our revenue projections were lowered because our Fab-1 manufacturing ramp was delayed in our first year of production. This is an unacceptable execution problem which I will discuss.
>
> However, as I look back on the decisions the company made, I would make the same calls again. For example, when Harrold Rust called me and said that Enovix

> Fab-1 would be delayed by at least three months due to the COVID-related shipping malaise unless we spent $1.4 million to charter the world's largest airplane, a Ukrainian AN-124, to fly over 55 tons of Fab-1 equipment to Silicon Valley in one shot, I said, 'Brilliant, do it.' Our decision violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.
>
> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.

172. Rodgers further addressed what he characterized as a perceived "problem[] concerning shareholders" relating to "the delay and projected underperformance of Fab-1," and, in doing so, made an additional misleading statement:

> We have poorly communicated on the status of Fab-1. I have heard from many investors that the delay and projected underperformance of Fab-1 must be the result of some catastrophic technology problem. ***For the record: Fab-1 is going to work and ship a lot of batteries to our customers, period.*** I will personally be in all Fab-1 reviews, because Fab-1 is not only critical to the Company, but also to our customers, some of whom are designing products right now that could not exist without Enovix battery performance.

173. The bolded portion in the above statement was misleading because it conveyed the false impression that the "delay and projected underperformance of Fab-1" reflected only temporary or minor setbacks that Enovix would readily overcome on its path to commercial-scale production. The sustained and repeated failures over the prior two years demonstrated the opposite. Rodgers suggested that Fab-1 was not fundamentally flawed, but had merely experienced a delayed "manufacturing ramp … during [Enovix's] first year of production." In reality, as Rodgers knew by November 2022, despite nearly two years of continuous testing, remediation, and attempted improvements by both Yinghe and Enovix personnel, the Fab-1 equipment never came close to achieving the capacity and quality specifications required for commercial production. As Rodgers was aware, by June 2022 the Fab-1 equipment was producing less than 10% of the specified

production rate of 550 UPH, and even by December 2022 it had failed to reach 20% of the required capacity. Accordingly, Rodgers lacked any reasonable basis for his unqualified assertion that "Fab-1 is going to…ship a lot of batteries to our customers." The above statement was not accompanied by sufficient or meaningful cautionary disclosures and therefore is not protected by the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995.

174. With the FAT and SAT largely behind Enovix, at least to the limited extent the market had been informed of the circumstances surrounding those processes, investor attention had shifted to the Company's forward-looking prospects and the purported "improvement activities" underway on Fab-1's production equipment. Rodgers's discussion of the FAT and SAT, together with his admission that Enovix's reduced 2023 revenue projection had been communicated in a "confusing manner that erroneously implied that there were bigger problems with [Enovix's] technology," further misled investors into believing that the issues delaying the Fab-1 production line were temporary and would soon be resolved.

175. Following Rodgers's statement, Enovix's share price rose by $1.11 per share from the prior trading day, as the market absorbed the information disclosed, including Rodgers's assumption of the Executive Chairman role, the explanations offered for the Fab-1 production delays, and Rodgers's representation that "Fab-1 is going to… ship a lot of batteries to our customers."

176. On November 10, 2022, Enovix announced the appointment of Ajay Marathe, an external hire, as the Company's Chief Operating Officer ("COO").

177. On December 29, 2022, Enovix announced that Defendant Rust would "retire" as President and CEO and resign from the Company's Board. Enovix named Rust's replacement that same day.

178. On January 3, 2023, following the close of market trading, Defendant Rodgers hosted a "special presentation to shareholders" via conference call. During that presentation, Rodgers again acknowledged the Company's "lack of clear and transparent investor communications" regarding Fab-1, stating that such communications "***led some of our investors to say we're outright dishonest with them***." Rodgers further conceded, "***I think they were reasonably misled***."

179. Rodgers further provided additional details regarding the first production line at Fab-1 and its disappointing production performance:

> Line 1 is the one we brought in the airplane, it's a Fremont wearables line, meaning make small batteries, uses the same heads, but it's nonfunctional for automation point of view. That means its rated capacity of 550 UPH is really more like 100. Obviously, that wreaks havoc with output and promises.

180. With respect to Line 2, Rodgers stated that it was incomplete. As he explained to investors during the January 3, 2023 conference call, "[i]t's only a partial line. We only built half the line," adding that "we didn't want to commit to the second half of the Line 2, until Line 1 worked." Rodgers further stated:

> If we run [the second line] at high OEE and high UPH, it then goes to 22.5 seconds when we lost the automation and the UPH dropped from 550 to 100. And it then went to 72 seconds when the OEE dropped because of the lack of automation and the need to do manual stuff in the yield problem. So what we started out is the battery every 2 seconds, ended up battery every 72 seconds, a battery 1 minute roughly. That's been the problem and it's got multiple causes.

181. According to Rodgers, although the equipment was "rated at 550" UPH, he conceded that "we don't think that machine if we worked on it forever would be over 200 [UPH]." Rodgers further confirmed that due to the deficiencies in the manufacturing equipment at Enovix's Fab-1 facility, "[b]y my math, Fab-1 is doing less than 10% of what it should be doing."

182. During the same presentation, Rodgers further disclosed additional delays affecting the Gen2 manufacturing lines, delays that he linked back to the persistent problems encountered with Fab-1 and its "Gen1" production lines:

> Gen2 equipment owners will prove to the board, in bold, that they've embedded all the learning from Gen1. So, Gen1 is not working the way we wanted to… And Gen2 can't have any of those problems and you have to prove to the board that.
>
> * * *
>
> Gen2 is going to work and Gen1 doesn't.

183. Rodgers acknowledged that the construction and commissioning of the Gen2 manufacturing lines would be delayed by several months, extending into the end of 2023 or the

beginning of 2024. As a result, revenues from the Gen2 lines that investors had previously been led to expect in early 2024 were no longer attainable.

184. During the same presentation, an analyst from B. Riley Securities specifically questioned Defendant Rodgers regarding his November 7, 2022 statement concerning the Company's violations of its EPR in connection with the Fab-1 equipment. In response, the Company's newly appointed COO, Ajay Marathe, explained that:

> So this time instead of just saying, okay let's give you the PO and hope for the best and let them give us a machine, which kind of works and we will see it or not. This time, we are building proofs of concepts, which means smaller machines that represent the heads, as T.J. mentioned, which are actually working in action, and we have seen those. You see the videos of those. Our engineers are over there many, many times. And many of them actually. I'm going there personally also this month where I'll be visiting these guys and establishing relationships with the CEOs myself.

185. Stated differently, the decision to waive the requirement that the Fab-1 equipment successfully pass the FAT materially contributed to the substantial delays and Fab-1's failure to achieve the Company's stated production objectives. Rather than "hop[ing] for the best" by allowing equipment vendors to "give us a machine" that Enovix had not meaningfully validated in advance (as occurred when Enovix waived the FAT requirement after months of repeated testing failures) the Company represented that, going forward, its engineers would personally travel to vendors' facilities to observe next-generation equipment firsthand and ensure that it passes the FAT prior to shipment and installation. This approach was intended to prevent the same deficiencies and failures that plagued Fab-1.

186. During the same presentation, Marathe emphasized the critical importance of successfully completing the FAT, explaining that the Company's confidence in its production lines "becomes at the very high point when we finish doing the factory acceptance test. When we're actually at the vendor, the machine is working, is running. It's running both the sprint UPH. It's running the uptime, it's running those types of things improved, actually seeing it. That's when typically the confidence is high and you start triggering the long lead time items."

187. In other words, successful completion of the FAT provides a manufacturer with the requisite confidence to justify significant investments of time and capital in the installation,

integration, and qualification of production equipment. By waiving the requirement that the Fab-1 manufacturing equipment pass the FAT, Enovix proceeded without that foundational confidence and, as a foreseeable consequence, encountered serious delays and operational failures in attempting to ramp Fab-1 to commercial-scale production. Accordingly, the waiver of the FAT following months of unsuccessful testing constituted a material fact that the Individual Defendants failed to disclose to investors until November 2022.

188. Following the disclosures made during the January 2023 special presentation, Enovix's stock price declined sharply, falling approximately 41% from a closing price of $12.12 per share on January 3, 2023 to $7.15 per share on January 4, 2023, on unusually heavy trading volume.

189. This decline was caused, at least in part, by disclosures that more fully revealed the breadth of the risks that had materialized as a result of the Individual Defendants' prior misrepresentations and omissions. Those disclosures showed not only that the purported "improvements" to the Fab-1 production lines were proceeding more slowly than had been represented in November 2022, but also that, more than eighteen months after delivery of the Fab-1 equipment to Fremont, the equipment was still operating at "less than 10% of what it should be doing." These admissions stunned the market, particularly given Rodgers's unequivocal assurances just two months earlier that "Fab-1 is going to work and ship a lot of batteries to [Enovix's] customers, period."

190. Rodgers's acknowledgment that investors had been misled was itself a disclosure of material adverse information. Reasonable investors purchase stock, and determine the price they are willing to pay, based in part on the belief that a company's management is candid and trustworthy. Rodgers's admission that Enovix's investors were "reasonably misled" by the Individual Defendants' prior statements therefore independently eroded investor confidence and adversely affected the Company's valuation and share price.

191. Nonetheless, the January 3, 2023 presentation still did not fully apprise the market of the scope of the undisclosed risks, which continued to unfold thereafter.

192. On October 3, 2023, Enovix announced that it was terminating commercial production operations at Fab-1 in their entirety, laying off approximately 185 employees and writing off the value of all equipment acquired for that facility.

> Enovix … announced that it has initiated a strategic realignment of Fab1 in Fremont designed to refocus the facility from a manufacturing hub to its "Center for Innovation," focused on new product development. This move is supportive of the Company's strategy to locate high-volume manufacturing in Asia near customers and suppliers while locating technology development in both Silicon Valley and Asia.
>
> Shifting Fab1's focus will result in a reduction of the workforce in Fremont that had been dedicated to supporting 24/7 manufacturing by approximately 185 personnel, including over 125 contractors.
>
> * * *
>
> Associated with the Fab1 strategic realignment, Enovix … expects to recognize accelerated depreciation expenses of approximately $36 million for Gen1 equipment between the fourth quarter of 2023 and the first quarter of 2024.

193. Following this announcement, Enovix's share price declined approximately 13%, falling from a closing price of $11.81 per share on October 2, 2023 to $10.30 per share on October 3, 2023, on unusually heavy trading volume.

## DAMAGES TO ENOVIX

194. As a direct and proximate result of the Individual Defendants' misconduct, Enovix has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

195. Such expenditures include, but are not limited to, legal fees associated with the Securities Action, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and paying any settlement or judgment that may result from the Securities Action.

196. These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

197. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such

as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

198. As a direct and proximate result of the Individual Defendants' actions, Enovix has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

199. Plaintiff brings this action derivatively in the right and for the benefit of the Company pursuant to Rule 23.1 of the Federal Rules of Civil Procedure to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

200. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

201. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

202. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

203. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

204. Because of the facts set forth throughout this Verified Stockholder Derivative Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

205. The Company's Board is currently comprised of eight members: Defendants Rodgers, Talluri, Atkins, Ebrahimi, Gutmann, Malchow, Reichow, and McCranie (together, the

"Directors"). Plaintiff is only required to show that a majority of the Directors, *i.e.*, four, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

206. Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

207. Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

208. Additionally, the Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Talluri**

209. Defendant Talluri is not disinterested or independent, and therefore is incapable of considering demand because Talluri, as President and CEO of the Company, is an employee who derives substantial compensation in his role with the Company making him not disinterested or independent.

210. The financial benefits received by Talluri renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

211. Notably, the Company's 2025 Proxy recognizes that Defendant Talluri is not an independent director.[5]

212. As such, Defendant Talluri cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

---

[5] The Company's 2025 Proxy also recognizes Defendant Rogers as not independent. The 2025 Proxy also specifies that, as of the date of that filing, Rogers owned 25,797,483 shares, or 13.2%, of Enovix's common stock, further demonstrating his lack of disinterest and independence.

**Audit Committee Defendants Gutmann (Chair), Ebrahimi, and Malchow**

213. Defendants Gutmann (Chair), Ebrahimi, and Malchow are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these defendants reviewed and approved the improper press releases made to the public. Despite their knowledge, these defendants caused these improper statements.

214. For these reasons, Gutmann (Chair), Ebrahimi, and Malchow breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Securities Action Defendants Rodgers, Atkins, Reichow, and McCranie**

215. Defendants Rodgers, Atkins, Reichow, and McCranie are further not disinterested or independent and, therefore, are incapable of considering demand because they are named as defendants in the Securities Action, which seeks to hold them liable for much of the same wrongdoing as is alleged herein. As such, they face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**All Directors**

216. The Directors, as members of the Board, were and are bound by the Code of Business Conduct and Ethics as well as the Company's Corporate Governance Guidelines (the "Codes"), which go well beyond the basic duties required by applicable laws, rules, and regulations. Specifically, the Codes require the Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Directors violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Directors breached the Company's Codes, face substantial liability, and are not independent or disinterested, making demand upon them futile.

217. Furthermore, demand, in this case is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

218. Enovix has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Enovix any part of the damages Enovix suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

219. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

220. The acts complained of herein constitute violations of fiduciary duties owed by Enovix's officers and directors, and these acts are incapable of ratification.

221. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Enovix. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any

action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Enovix, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

222. If there is no directors' and officers' liability insurance, then the Directors will not cause Enovix to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

223. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty Against the Individual Defendants

224. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

225. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Enovix's business and affairs.

226. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Enovix's shareholders.

227. In breach of their fiduciary duties owed to Enovix, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

228. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Enovix's securities.

229. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Enovix's securities.

230. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

231. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Enovix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

232. Plaintiff, on behalf of Enovix, has no adequate remedy at law.

**COUNT II**
**Violations of Section 14(a) of the Exchange Act Against the Individual Defendants**

233. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

234. Pursuant to Section 14(a) of the Exchange Act, "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

235. Rule 14a-9, promulgated under § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

236. Under the direction and oversight of the Individual Defendants, the Company's Proxy Statements filed during the Relevant Period omitted material facts, including that: (i) that the Fab-1 equipment supplied by Yinghe never achieved performance in accordance with specifications despite several months of factory acceptance testing in China; (ii) that the Company had affirmatively waived the requirement that the equipment pass the FAT prior to taking delivery, including that such waiver enabled the decision to transport the equipment from China by air; and (iii) that, even after months of on-site testing in California, the equipment remained far from meeting Enovix's required performance specifications.

237. In addition, the Proxy Statements filed during the Relevant Period failed to disclose that the Board's oversight and risk management functions were deficient and that the Company's Codes were not being followed, as evidenced by the Individual Defendants' participation in or facilitation of the Company's misleading statements.

238. The Individual Defendants either knew or acted with reckless disregard for the truth in misrepresenting or omitting the foregoing material facts, thereby rendering the statements in the Proxy Statements filed during the Relevant Period materially false and misleading. These misrepresentations and omissions were material to Plaintiff and other Company shareholders in

evaluating and voting on the proposals submitted for shareholder consideration in those Proxy Statements.

239. The misrepresentations and omissions in the Proxy Statements filed during the Relevant Period were material to Plaintiff and the Company's shareholders with respect to their votes on the shareholder matters presented therein, including but not limited to: the election or reelection of Defendants Rogers, Atkins, Ebrahimi, Malchow, Reichow, McCranie, Talluri, Gutmann, Rust, and Hernandez to the Board, thereby enabling the continued breach of their fiduciary duties.

240. As a direct and proximate result of the material misrepresentations and omissions in the Proxy Statements filed during the Relevant Period by the Individual Defendants, the Company suffered damages.

241. Plaintiff on behalf of Enovix, has no adequate remedy at law.

**COUNT III**
**Unjust Enrichment Against the Individual Defendants**

242. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

243. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Enovix.

244. Each of the Individual Defendants received payment from Enovix, in the form of either salary or director fees while actively breaching their fiduciary duties to Enovix.

245. All the payments and benefits provided to the Individual Defendants were at the expense of Enovix. The Company received no benefit from these payments.

246. Plaintiff, as a shareholder and a representative of Enovix, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

247. Plaintiff, on behalf of Enovix, has no adequate remedy at law.

**COUNT IV**
**Waste of Corporate Assets Against the Individual Defendants**

248. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

249. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Enovix to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

250. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

251. Plaintiff, on behalf of Enovix, has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants, jointly and severally, as follows:

(a) Declaring that the Plaintiff may maintain this action on behalf of Enovix and that Plaintiff is an adequate representative of the Company;

(b) Determining that a pre-suit litigation demand on the Board would be futile and is thus excused;

(c) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Enovix, were unjustly enriched, committed corporate waste, and violated the federal securities laws, as set forth above;

(d) Determining and awarding to Enovix the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e) Directing the Individual Defendants to take all necessary actions to reform and improve Enovix's corporate governance and internal procedures to comply with applicable laws and to protect Enovix and its shareholders from a repeat of the damaging events described herein;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 6, 2026

**SCHUBERT JONCKHEER & KOLBE LLP**

*/s/ Dustin L. Schubert*

Dustin L. Schubert (S.B.N. 254876)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St., Suite 200
San Francisco, California 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
E-mail: dschubert@sjk.law

Justin A. Kuehn (*pro hac vice* forthcoming)
Molly J. Brown (*pro hac vice* forthcoming)
**KUEHN LAW, PLLC**
53 Hill St., Suite 605
Southampton, New York 11968
Telephone: (833) 672-0814
E-mail: justin@kuehn.law
molly@kuehn.law

*Counsel for Plaintiff Ross Thomas*

**VERIFICATION**

I, Ross Thomas, am a plaintiff in the within action. I have reviewed the allegations made in the Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. To those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and, for that reason, believe them to be true.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on 02 / 20 / 2026.

Ross Thomas